IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM TEAS,

                                        OPINION AND ORDER

            Plaintiff,

                                    16-cv-452-bbc

          v.

DALIA SULIENE, KARL HOFFMAN,
KAREN ANDERSON, MEREDITH MASHANK,
LILLIAN TENEBRUSO, NANCY WHITE,
ANTHONY ASHWORTH, LUCAS WEBER,
JANEL NICKEL, KEVIN BOODRY,
MICHAEL DITTMAN, JAMES GREER,
SCOTT BAUER and JAMES KOTTKA,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Pro se plaintiff William Teas is proceeding in this case on claims that several employees of the Columbia Correctional Institution violated his rights under the Eighth Amendment, the Americans with Disabilities Act, the Rehabilitation Act and Wisconsin law, by failing to provide him adequate treatment and accommodations for chronic back pain. Now before the court is defendants' motion for summary judgment. Dkt. #75. Defendants argue that plaintiff cannot show that they consciously disregarded his serious medical needs, ignored any substantial risk of serious harm or failed to provide accommodations for his disabilities. I agree with defendants. Although I am sympathetic to plaintiff's ongoing pain, he has failed to submit evidence showing that any of the individual defendants violated his rights under federal law. Accordingly, I will grant defendants' motion for summary judgment as to plaintiff's claims under the Eighth Amendment, Americans with Disabilities Act and

Rehabilitation Act. I will decline to exercise jurisdiction over plaintiff's malpractice claims.

Before turning to the facts, I must address some preliminary matters raised by plaintiff. Plaintiff filed a motion to strike the declarations of the individual defendants, on the ground that they are signed electronically with a "/s," not personally by the defendants. Dkt. #113. However, Rule 5(d) of the Federal Rules of Civil Procedure specifically provides that "[a] person represented by an attorney must file electronically" and "[a] filing made through a person's electronic-filing account and authorized by that person, together with that person's name on a signature block, constitutes the person's signature." In this case, all of the defendants are represented by a lawyer, Elliot Held, who electronically filed the declarations on defendants' behalf. All of defendants' declarations comply with section III.E of this Court's Electronic Filing Procedures (available online at www.wiwd.uscourts.gov/electronic-filing-procedures), which provides that non-CM/ECF filing users' signatures may be submitted electronically after the original signature is obtained. Plaintiff has identified no valid basis to strike defendants' declarations.

In his motion to strike, plaintiff also argues that defendants' proposed findings of fact should be disregarded because, when defendants answered plaintiff's amended complaint, they failed to dispute any of plaintiff's allegations. Plaintiff is mistaken. In answering plaintiff's amended complaint, defendants stated that they "DENY all of the allegations in the plaintiff's amended complaint." Dkt. #38. Accordingly, I will deny plaintiff's motion to strike defendants' declarations and defendants' proposed findings of fact.

From the parties' proposed findings of facts and responses, I find the following facts

to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

Plaintiff William Teas has been incarcerated at Columbia Correctional Institution since November 2008. Most of the defendants worked at Columbia during the relevant time period: Dalia Suliene was a physician; Lillian Tenebruso, Nancy White, Karen Anderson and Meredith Mashak were health services unit managers; Anthony Ashworth was a unit manager; Janel Nickel was the security director; Scott Bauer was a correctional officer; James Kottka was a sergeant; Kevin Boodry was a lieutenant and a captain; Lucas Weber was the security supervisor; and Michael Dittman was the warden from March 2014 to July 2018. Plaintiff has also sued James Greer, who was the director of the Bureau of Health Services within the Division of Adult Institutions.

### B. Medical Care at Columbia Correctional Institution

When an inmate has a medical concern or wants to be seen by health services staff, the inmate submits a health service request. The requests are "triaged", that is, reviewed to determine which required immediate responses by nursing staff. There are approximately 800 inmates at Columbia, so nursing staff must prioritize which inmates see the doctors first. Nursing staff attempts to handle patient concerns that do not require attention from a doctor. For non-emergency symptoms and problems that do not require immediate

3

evaluation from a doctor, nursing staff typically work with the patient to rule out simple causes and find solutions to the problem through education and over-the-counter medications. The nurse will advise the patient to contact a health care provider if the problem is not resolved.

Nursing staff are not authorized to order testing or prescribe medication, other than over-the-counter drugs. Advanced care providers (doctors and nurse practitioners) must prescribe medication, order outside appointments with specialists and complete authorizations for offsite medical care. To do so, the advanced care provider prepares an off-site service request and report form, explains what type of care is being requested and identifies the potential provider. If an offsite appointment is approved, the appointment is scheduled with the outside provider. Inmates must wait for an appointment for non-emergency services until outside providers are available.

The institution health services manager oversees the operation of the health services unit generally. In light of the administrative duties of the health services managers, they do not evaluate, diagnose, prescribe medications or provide direct patient care to inmates. The health services managers being sued in this case, defendants Tenebruso, Anderson, White and Mashak, did not treat plaintiff directly, were not involved with plaintiff's treatment and did not have the authority to prescribe medication or override the treatment decision of the physician and nurse practitioners who did treat plaintiff.

## C.  Special Needs

In 2009, the Department of Corrections began revising its policies related to special needs items, including extra pillows, mattresses, bunk restrictions and special shoes, due to concerns that medical providers were spending too much time on requests by inmates for special items.  All Department of Corrections institutions were instructed to develop a "special needs committee," consisting of nursing, security, management and sometimes psychology staff, that would be responsible for making decisions regarding inmates' requests for special items.  After 2009, the special needs committee at Columbia had to approve restrictions for "raised bunk" or "no floor placement."

Also, in 2009, the Department purchased new mattresses, known as "the blue or black mattresses," that were purported to be thicker and less likely to break down over time than the previous mattresses.  The mattresses were distributed over time to the various institutions.  After the new mattresses were available to the prisons, the Bureau of Health Services concluded that it was no longer necessary to authorize "double mattresses" for inmates, as one of the new mattresses was supposed to be equivalent to two of the old mattresses.

## D.  Segregation Unit

Columbia Correctional Institution has three segregation units: disciplinary segregation 1 (DS1); disciplinary segregation 2 (DS2); and the special management unit (Unit 7).  DS1 houses inmates who (1) have just arrived in segregation, or (2) are having

behavioral problems. DS2 is a "step-down" unit that houses inmates who have been in DS1 and shown a positive adjustment in their behavior. Finally, Unit 7 serves a variety of purposes, but mainly houses mentally ill and vulnerable inmates.

DS1 has concrete or metal beds that are five inches off the floor, with the exception of cell #43, which has a raised bunk, and which is generally reserved for wheelchair bound inmates, those with significant medical needs or inmates on observation status. DS2 has 50 beds that are 19 inches off the floor and Unit 7 has 12 raised beds. (The beds in general population are also raised.) If two inmates are housed in a single segregation cell, one inmate will be placed on a "bunk" on the floor.

The population in the restrictive housing unit is constantly changing as new inmates arrive with different needs. Many factors affect cell placement, including daily inmate population, available space, changes in inmate disciplinary status and medical or psychiatric needs. The unit manager and security supervisors have the ultimate placement decision-making authority, and unit sergeants may move inmates as unit needs required. Correctional officers were not authorized to make decisions regarding inmate movement or placement. The Department maintains a record of inmate movement between cells but does not record the specific reasons for the movement of inmates to different cells.

E.  Plaintiff's Medical Treatment and Cell Placement

Plaintiff suffers from degenerative disc disorder, significant effacement of the spinal cord and paraspinal muscle spasms that cause him to suffer chronic severe back pain. At

times, plaintiff cannot engage in any activities. He struggles with sleeping, concentrating and interacting with others.

1. <u>2009 and 2010</u>

After he arrived at Columbia Correctional in November 2008, plaintiff complained to defendant Dr. Suliene about shooting pain and numbness in his right arm. Suliene referred plaintiff to UW Health for testing. The testing was done on June 19, 2009, and the results showed that plaintiff had "right C6 and C7 radiculopathy, chronic and active" and "no evidence of entrapment neuropathy or brachial plexopathy." Dkt. #79-1 at 102. On October 23, 2009, UW Health took a magnetic resonance imaging of plaintiff, which showed multilevel degenerative disk and facet joint disease, central stenosis at L3-L4 and L4-L5, small midline protrusion at L4-L5 and foraminal stenosis at L4-L5 and L5-S1. Id. at 65.

On January 27, 2010, UW Health Neurosurgery recommended that plaintiff receive an L4-L5 laminectomy for his stenosis, which is a condition in which an individual's spinal column is narrower than normal in places. On February 1, 2010, defendant Suliene requested surgery approval from the Department of Corrections. The request was approved, and plaintiff received an L4 laminectomy and bilateral medical facetectomy at UW Hospital on April 7, 2010.

When plaintiff returned to the prison after his surgery on April 8, 2010, nursing staff and defendant Suliene provided him post-operative care that included monitoring the incision area, changing the dressing and distributing pain medication, including Vicodin, a

narcotic medication, and Flexeril, a muscle relaxant. On April 10, plaintiff submitted a health service request stating that he was experiencing excruciating pain in his back, shooting pains in both legs and was urinating blood frequently with a burning sensation. He said that the Vicodin was inadequate for the severity of his pain and that he needed an increase in the dosage or a different medication. Suliene saw plaintiff on April 12. (Defendants say that plaintiff reported that he was doing "ok" at the April 12 appointment. Plaintiff disputes this, stating that he told Suliene that he was experiencing constant back pain and that the Vicodin was not helping, and that Suliene responded that she could not approve a higher dosage of Vicodin under the prison's "Narcotic Grade Medication" limitations.)

In the meantime, on April 11, plaintiff was placed in "receiving and orientation," a small unit close to health services, where he remained until May 17, 2010. On April 16, plaintiff was given ibuprofen and an extra pillow. (The special needs committee had granted a permanent authorization for an extra pillow to plaintiff starting in 2009.) On May 11, Suliene renewed plaintiff's Vicodin prescription for two weeks, started him on baclofen, for muscle spasms, and directed that plaintiff be scheduled to see a UW doctor for a follow-up on his back surgery. Plaintiff saw Dr. Daniel Resnick at UW Hospital on May 27. Resnick noted that the surgery had resolved plaintiff's leg pain but that plaintiff was still experiencing back pain. Resnick recommended that plaintiff stay active, limit periods of sitting and use ibuprofen as needed. He also noted that plaintiff did not need to return to the Neurosurgery Clinic for additional follow-up. Dkt. #79-1 at 40. (Plaintiff says that Resnick told him that he could not prescribe pain medication because of a contract between UW Health and the

prison system, which mandated that only prison medical staff would prescribe pain medication. He also says that Resnick told him that he should have a bed two feet off of the ground. However, these allegations about what Resnick said are inadmissible hearsay because plaintiff is attempting to rely on an unsworn statement made outside of court to prove that UW Health doctors could not prescribe pain medication and recommended a specific bed height. Therefore, I cannot consider Resnick's alleged statements. <u>Burton v. Kohn Law Firm, S.C.</u>, 934 F.3d 572, 583 (7th Cir. 2019) (hearsay statements are no admissible evidence at summary judgment)).

Around this time, plaintiff requested an additional mattress, stating that his current mattress caused him pain. On June 18, 2010, the special needs committee authorized a "thick" mattress for plaintiff, which meant a blue and black mattress, because extra mattresses were no longer allowed. However, plaintiff's cell already had the blue and black mattress in it. Plaintiff did not receive any different or additional mattress.

On June 30, 2010, Suliene requested that plaintiff to be evaluated by a UW doctor for his ongoing complaints of back pain. She also restarted him on ibuprofen. (It is not clear whether plaintiff had run out of ibuprofen at this point.) On July 14, 2019, Suliene prescribed glucosamine to see whether it might give plaintiff some relief for his joint pain and nortriptyline for treating his neuropathic pain. Plaintiff was also taking citalopram at this time, which is an antidepressant that can be useful in treating pain. Health services renewed the citalopram and ibuprofen prescriptions in September and October 2010. Around this time, plaintiff renewed his request for an extra mattress. The special needs

committee again approved a "thick" mattress for plaintiff, even though he already had one.

On November 2, 2010, plaintiff submitted a health service request, stating that his back and neck pain had increased. On November 3, plaintiff refused an appointment with a nurse, stating that he wanted to wait for a follow-up with a medical doctor. (Plaintiff says he refused the appointment because he knew that the nurse could not do anything and that he would have to pay a co-pay for no reason.)

On November 23, plaintiff submitted a health service request stating that he was experiencing severe back and neck pain that was not subsiding. Plaintiff received a response the next day, stating that he would be seen by a doctor on November 30 and reminding him that UW Neurosurgery had recommended that he "stay active and strengthen your core." Dkt. #79-1 at 50. The November 30 appointment was later rescheduled until after plaintiff completed physical therapy sessions.

On December 6, 2010, plaintiff saw Suliene for neck stiffness and pain, which he said was exacerbated by his current mattress. Suliene gave plaintiff a booklet for lower back exercises and renewed his prescription for baclofen.

2. <u>2011</u>

On January 10, 2011, plaintiff met with Suliene and told her that the baclofen was not helping. Suliene ordered additional physical therapy and x-rays of plaintiff's hips and pelvis. She discontinued the baclofen and started plaintiff on gabapentin. On January 18, plaintiff had diagnostic imaging done on his hips, showing minimal degenerative changes,

but nothing acute.  Dkt. #79-1 at 46-47.

On February 10, 2011, Suliene increased plaintiff's gabapentin dosage to 300 mg. Plaintiff received eight physical therapy visits from February 22, 2011 through April 12, 2011.  On April 12, plaintiff told Suliene that the gabapentin was not working.  Suliene increased the gabapentin dosage to 600 mg.  On May 12, Suliene requested approval for plaintiff to receive an epidural spinal injection.  On May 18, plaintiff submitted another health service request complaining of back and neck pain.

Plaintiff saw Suliene a few days later, and told her that he had excruciating pain when getting up from the floor.  Plaintiff told Suliene that he had requested a "no floor placement restriction," but that it had been denied by the special needs committee.  Suliene renewed plaintiff's gabapentin prescription and told him that an epidural injection was scheduled, as well as a follow-up with UW Neurosurgery.

On June 7, plaintiff received an epidural injection at UW Hospital.  That same day, Suliene requested an appointment for plaintiff with UW Spine Clinic and another steroid injection to relieve his symptoms.  Dkt. #79-1 at 26.  The request was approved.

On June 19, plaintiff submitted a health service request asking that a doctor's appointment be scheduled for his back and neck.  Health services responded that plaintiff would be seen by UW Health in July.  On July 28, plaintiff saw Resnick at UW Neurosurgery.  Resnick noted that plaintiff had no leg pain, but had some numbness and weakness in his left leg.  Plaintiff also complained of continued back pain.  Resnick told plaintiff to continue to stay active, limit his periods of sitting and use ibuprofen as needed.

Resnick noted that plaintiff did not need further treatment from UW Neurosurgery. Dkt. #79-1 at 31.

On August 10, 2011, Suliene increased plaintiff's citalopram to 40 mg. On August 22, plaintiff saw Suliene again, and told her that the gabapentin was not working. Suliene reduced plaintiff's gabapentin dosage, but told him that he could take a low dose of gabapentin twice a day if he wanted to. Plaintiff still had ibuprofen available. Suliene told plaintiff that exercise and physical therapy would help his pain. On August 29, plaintiff saw Suliene again. Suliene again advised plaintiff to use physical therapy for strengthening.

Plaintiff received ten physical therapy visits from October 4, 2011 through February 9, 2012. On January 10, a prison physician noted that plaintiff had improved 80% with seven physical therapy sessions, and the doctor proposed six additional visits.

3. <u>2012</u>

On March 14, 2012, security director defendant Nickel directed officers to conduct urinalyses on inmates in temporary lockup, including plaintiff. Plaintiff's urine sample was positive for cocaine. (Plaintiff says he used cocaine to address his chronic pain.) Plaintiff was found guilty of a major offense and was given 180 days in disciplinary separation. He was placed in DS2. On March 26, 2012, a sergeant searched plaintiff's property and found contraband. As a result of these violations, defendant Bauer was directed to move plaintiff from DS2 to DS1. Between March 26 and April 20, plaintiff was in a cell with a bed only five inches from the floor. Plaintiff notified defendants Bauer, Ashworth, Nickel, Kottka,

Anderson and White that he should not be on a low bunk. On April 20, 2012, cell #43, the observation cell with a raised bed in DS1 became available, and plaintiff was moved into it. However, on May 8, defendant Boodry moved plaintiff to another cell in DS1 because cell #43 was needed to observe another inmate. He was moved back to DS2 on May 26, 2012.

On May 24, 2012, plaintiff saw Suliene about his ongoing back pain. Suliene directed him to continue taking gabapentin twice a day and ibuprofen. On June 9, Suliene requested that plaintiff be scheduled with UW Rehabilitation. On July 16, Suliene saw plaintiff for neck and right arm pain. She referred him to physical therapy.

On August 27, 2012, plaintiff wrote to defendant Anderson, the health services manager, stating, "I'm writing to inform you that my back is still being treated ineffectively. I haven't received any treatment for my severe pain that is working. My condition is worsening. Will you please help?" Anderson responded that plaintiff was being seen by Dr. Suliene and was on the list for another round of physical therapy. Plaintiff started physical therapy again in September 2012.

On September 14, plaintiff wrote to Anderson again, stating, "I realize you are sick or growing sick of my near constant correspondence but I am equally tired and frustrated. I'm confused as to why you will not address my problem or help me." Anderson responded that she would discuss physical therapy for his neck with Suliene. She also told him that health services was still waiting to schedule a UW appointment because they were waiting for authorization to see an outside provider.

On October 19, plaintiff wrote to Anderson stating that because of his worsening back

condition, he could not stand on one leg and wash his lower extremities during showers. He was losing his balance and had fallen in the shower. He asked for an authorization to use a seat while showering. The request was forwarded to Suliene, who responded that plaintiff should stand on two feet to avoid slipping. On October 31, plaintiff wrote to Anderson asking for a medical authorization to shower on the unit. The special needs committee subsequently permitted plaintiff to shower on the unit with a shower chair, starting in November 2012.

On November 8, plaintiff submitted a health service request stating that he had extreme back pain, that his medication was ineffective and that he was having trouble standing and balancing on one leg in the shower. He submitted a similar health service request on November 12. Health services responded that plaintiff should continue with his physical therapy exercises. On December 4, plaintiff wrote to Anderson stating that Suliene was not treating his medical concerns. Anderson responded that his problems were being addressed and that he should continue with physical therapy, take his medications and follow special needs as ordered. On December 4, plaintiff saw Suliene again for ongoing neck, shoulder and joint pain. Suliene recommended ice and ibuprofen. Suliene also started plaintiff on amitriptyline, which is an antidepressant and told plaintiff that health services was still waiting for a response from the UW Spine Clinic about a potential appointment for him.

4. <u>2013 treatment</u>

On January 7, 2013, plaintiff submitted a health service request, stating that his current course of treatment was ineffective for his back and hip pain. Health services responded that he should take his pain medication, continue physical therapy, use ice and stretching and "increase his pain tolerance."

On February 12, Suliene increased plaintiff's dosage of gabapentin and added meloxicam, a nonsteroidal anti-inflammatory drug. Health services again contacted UW Spine Clinic to schedule an appointment, but no providers were available. Suliene told plaintiff to continue with physical therapy at the prison until an outside appointment could be made. On February 19, health services contacted UW Spine Clinic, UW Rehabilitation Medicine and UW Neurosurgery, attempting to schedule an appointment for plaintiff. Health services was eventually able to schedule an appointment for plaintiff with Rehabilitation Medicine.

On March 18, plaintiff saw Suliene for neck and shoulder pain. The plan was to continue on gabapentin and with physical therapy and follow up after plaintiff's appointment with UW Rehabilitation. Suliene left Columbia Correctional Institution on April 5, 2013.

On April 19, 2013, plaintiff saw Dr. Rudin at UW Rehabilitation Clinic. Plaintiff complained that gabepentin was not helping. Dr. Rudin recommended that (1) plaintiff should try tapering off and discontinuing gabapentin, unless the pain increased, in which case he should resume it; (2) try baclofen again, to replace the amitriptyline he was taking; (3) use a support brace and TENS unit; and (4) undergo medical imaging. After plaintiff

returned to the prison, he received a back brace and TENS unit

Plaintiff had medical imaging of his lumbar and cervical spine on June 17, 2013 that showed further degeneration. He was subsequently referred to UW Health for an epidural injection and nerve block. He received the injection and nerve block in December 2013.

(Plaintiff was in restricted housing unit 2 from September 2, 2013 to January 2, 2014.)

5. <u>2014 and 2015</u>

On February 7, 2014, a doctor from UW Orthopedics reviewed plaintiff's most recent x-rays and recommended an epidural injection and a follow-up appointment. Defendant Dr. Hoffman completed an off-site service request for the epidural injection on February 12, defendant, and plaintiff received the injection on March 20, 2014.

On August 1, 2014, plaintiff had a follow-up clinic visit at UW Orthopedics. The UW doctor recommended that plaintiff continue the pain management plan in place at the prison, physical therapy and epidural injections in the future. He said that plaintiff could consider a repeat lumbar laminectomy if his symptoms worsened. Plaintiff continued with physical therapy at the prison from August to October 2014.

On March 6, 2015, plaintiff returned to UW Orthopedics for a follow-up visit. The orthopedic surgeon recommended: "no surgery at this time, refer to primary or pain management" and "refer to ER if bowel/bladder dysfunction or coordination deficits." Dkt. #79-1 at 77.

On May 1, 2015, plaintiff was taken to the emergency room at Divine Savior hospital for his back pain. He was prescribed 15 tablets of Flexeril and was provided information about back pain, chronic back pain and the problem of narcotic painkillers.

## OPINION

Plaintiff is proceeding on the following claims:

(1) defendants Suliene and Hoffman (prison physicians) failed to treat plaintiff's back pain adequately, in violation of the Eighth Amendment and Wisconsin law;

(2) defendants Suliene, Hoffman, Mashak (health services manager), Greer (director of Bureau of Health Services), Dittman (warden) and Weber (security supervisor) denied requests for a "medically appropriate mattress and pillow," in violation of the Eighth Amendment, the Americans with Disabilities Act and the Rehabilitation Act;

(3) defendants Boodry (lieutenant and a captain), Ashworth (unit manager), Nickel (security director), Bovar (correctional officer), Kottka (sergeant), White (health services manager) and Anderson (health services manager) denied plaintiff's requests for a raised bunk while he was housed in segregation, in violation of the Eighth Amendment, the Americans with Disabilities Act and the Rehabilitation Act;

(4) defendants Anderson, Mashak, Tenebruso and White (health services managers) failed to schedule appointments with physicians in a timely manner, in violation of the Eighth Amendment and Wisconsin's medical malpractice law; and

(5) defendants Anderson, Mashak, Tenebruso and White (health services managers)

failed to take any action when defendants Suliene and Hoffman failed to provide appropriate treatment for plaintiff's back problems, in violation of the Eighth Amendment and Wisconsin's medical malpractice law.

Defendants have moved for summary judgment on all of plaintiff's claims under the Eighth Amendment, the Americans with Disabilities Act and the Rehabilitation Act. They have also moved for summary judgment on plaintiff's malpractice claims against the non-physician defendants on the ground that plaintiff failed to file a notice of claim as required by Wisconsin law. Finally, defendants request that the court decline to exercise supplemental jurisdiction over any remaining state law claims. I address each of defendants' arguments and plaintiff's responses below.


## A. Eighth Amendment

The Eighth Amendment's prohibition on cruel and unusual punishment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain,'" including "grossly inadequate medical care." Pyles v. Fahim, 771 F.3d 403, 408 (7th Cir. 2014) (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)). To prevail on a claim based on deficient medical care, the plaintiff "must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011). The first element, an objectively serious medical condition, is satisfied if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." Pyles, 771 F.3d at

409.  See also Gutierrez v. Peters, 111 F.3d 1364, 1370–73 (7th Cir. 1997).  The parties do not dispute that plaintiff's ongoing back problems and chronic pain were objectively serious medical conditions.  The dispute focuses on the second element: whether defendants acted with deliberate indifference.

"Deliberate indifference is a subjective standard."  Arnett, 658 F.3d at 751.  To be found liable under the Eighth Amendment, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  See also Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016) (en banc) ("[T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm.").  Whether a prison official acted with the requisite state of mind "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Farmer, 511 U.S. at 842.  In making this assessment, "we must examine the totality of an inmate's medical care."  Dunigan ex rel. Nyman v. Winnebago Cty., 165 F.3d 587, 591 (7th Cir. 1999) (quoting Gutierrez, 111 F.3d at 1375).  To establish the requisite mental state, our cases make clear that "[s]omething more than negligence or even malpractice is required."  Pyles, 771 F.3d at 409; see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

"Within the universe of deliberate indifference cases is a narrower category when a prisoner alleges not that his condition was ignored entirely, but that he received

constitutionally deficient treatment for the condition." <u>Lockett</u>, No. 19-1012, –F.3d–, 2019 WL 4051867, at *5. These cases are better framed "not [as] deliberate indifference to a serious medical need," but as a challenge to "a deliberate decision by a doctor to treat a medical need in a particular manner." <u>Snipes v. DeTella</u>, 95 F.3d 586, 591 (7th Cir. 1996). In such cases, courts must defer to a medical professional's treatment decision "unless 'no minimally competent professional would have so responded under those circumstances.'" <u>Pyles</u>, 771 F.3d at 409 (quoting <u>Sain v. Wood</u>, 512 F.3d 886, 894–95 (7th Cir. 2008)). A "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." <u>Id.</u> There is no single "'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." <u>Jackson v. Kotter</u>, 541 F.3d 688, 697 (7th Cir. 2008). However, "where evidence exists that the defendant[ ] knew better than to make the medical decision[ ] that [he or she] did," then summary judgment is improper and the claim should be submitted to a jury. <u>Whiting v. Wexford Health Sources, Inc.</u>, 839 F.3d 658, 662–63 (7th Cir. 2016) (citations omitted).

Evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in "a course of treatment known to be ineffective"; or proof that the defendant's treatment decision departed so radically from "accepted professional judgment, practice, or standards" that a jury may reasonably infer that the decision was not based on professional judgment. <u>Id.</u> A

medical professional's choice to pursue an "'easier and less efficacious treatment'" or "a non-trivial delay in treating serious pain" may also support a claim of deliberate indifference. Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010) (citation omitted).

1. Dr. Suliene's and Dr. Hoffman's treatment of plaintiff's back pain

Defendant Suliene treated plaintiff for several years, between 2009 and 2013, and Hoffman treated plaintiff starting in 2014. Plaintiff concedes that Suliene and Hoffman saw him and provided him some care, but he argues that they provided him with inadequate care under the circumstances. Because these defendants provided plaintiff with some treatment, the relevant question under the Eighth Amendment is whether their actions were "such a substantial departure from accepted professional judgment, practice, or standard, as to demonstrate that the person responsible actually did not base the decision on such a judgment." Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996). Plaintiff has not submitted evidence to show that Suliene or Hoffman failed to use medical judgment in making treatment decisions.

Beginning in 2009, Suliene referred plaintiff to specialists at UW. She requested approval for plaintiff's surgery in 2010, and after his surgery, saw him regularly for his complaints of pain. Over the next three years, Suliene prescribed numerous pain relief medications, including Vicodin, Flexeril, ibuprofen, baclofen, glucosamine, nortriptyline, citalopram, gabapentin and meloxicam. Suliene adjusted the dosage and types of medication in response to plaintiff's complaints of ineffectiveness. Suliene also referred plaintiff to

physical therapy on numerous occasions, referred him for epidural steroid injections and requested several appointments with outside specialists at UW. The UW notes do not include any mention of inappropriate care being provided by DOC physicians, do not recommend medications different from those prescribed by Supiene and, instead, often recommended that plaintiff continue the current plan implemented by DOC providers.

As for Hoffman, the records show that he prepared a plan to address plaintiff's chonic pain and referred plaintiff to UW for epidural injections. There is no evidence that the UW doctors thought Hoffman's pain plan was insufficient or unreasonable.

Plaintiff complains that Suliene and Hoffman refused to prescribe him narcotic pain medication, despite knowing that the numerous other medications he had tried were not relieving his pain. However, the Court of Appeals for the Seventh Circuit has routinely rejected claims that are " based on a preference for one medication over another unless there is evidence of a substantial departure from acceptable professional judgment." Lockett v. Bonson, No. 19-1012, —F.3d—, 2019 WL 4051867, at *4–5 (7th Cir. Aug. 28, 2019). In Burton v. Downey, 805 F.3d 776, 785–86 (7th Cir. 2015), the court of appeals considered a claim by a detainee who had requested narcotic medication to address his pain after surgery. Prison staff prescribed a non-narcotic pain medication, even though a primary care physician outside the prison previously had prescribed a narcotic. Prison staff noted that the synthetic opiate that they administered had "less addictive potential" than the primary care physician's stronger method of pain relief. Id. at 786. The fact that the physician outside the prison had prescribed another medication merely demonstrated "that another doctor

would have followed a different course of treatment," which was "insufficient to sustain a deliberate indifference claim." Id. To meet such a standard, the plaintiff needed evidence showing a "substantial departure from accepted professional judgment," but the decision to prescribe non-narcotic pain medication was within the bounds of professional judgment. Id. at 785–86; see also Snipes, 95 F.3d at 591 (noting that "[t]he administration of pain killers requires medical expertise and judgment" and that their use "entails risks that doctors must consider in light of the benefits").

In this case, as in Burton, the record shows that defendants Suliene and Hoffman exercised their medical judgment in determining which pain medications to prescribe to plaintiff. Suliene did prescribe Vicodin, an opiod narcotic medication, immediately after plaintiff had surgery in 2010. However, because Suliene did not think narcotic medications should be prescribed long-term, she then switched plaintiff to different medications, adjusting them as needed. Similarly, Hoffman declined to prescribe narcotic medications, instead prescribing medications that are safer to use on a long-term basis.

No reasonably jury could conclude that Suliene or Hoffman failed to use medical judgment in declining to prescribe narcotic medication to plaintiff. Instead, the record, taken as a whole, demonstrates that Suliene and Hoffman diligently attended to plaintiff's needs. They examined plaintiff regularly and promptly to address his complaints about pain in his back, neck and joints. They adjusted treatment plans in response to plaintiff's complaints. They repeatedly encouraged plaintiff to engage in physical exercise as a proactive measure to mitigate his chronic pain. In addition, plaintiff has cited no evidence

suggesting that it would have been appropriate to prescribe narcotics for his chronic pain, and mere "[d]isagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Pyles, 771 F.3d at 409. Therefore, Suliene and Hoffman are entitled to summary judgment on this claim.

2. Defendants Anderson's, Mashak's, Tenebruso's and White's failure to intervene in Suliene's and Hoffman's treatment decisions and delay in scheduling appointments

Plaintiff contends that defendants Anderson, Mashak, Tenebruso and White, who were health services managers during various time periods, violated his Eighth Amendment rights by failing to take any action when defendants Suliene and Hoffman failed to provide appropriate treatment for plaintiff's back problems. As discussed above, plaintiff has not submitted evidence showing that Suliene or Hoffman provided unreasonable or improper treatment to him. Therefore, the health services managers cannot be liable for failing to intervene in their treatment. In addition, nurses are entitled to rely on the treatment decisions by physicians. Pyles, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances."). The health service managers did not have authority to prescribe medication or overrule the treatment plans put in place by Suliene and Hoffman. Miller v. Harbaugh, 698 F.3d 956, 962 (7th Cir. 2012) ("[D]efendants cannot be [held liable under the Eighth Amendment] if the remedial step was

not within their power.").

Plaintiff also contends that defendants Anderson, Mashak, Tenebruso and White failed to schedule appointments with outside specialists in a timely manner. However, plaintiff has submitted no evidence that these defendants were responsible for scheduling any of his appointments. Instead, the evidence shows that health services managers generally do not evaluate, diagnose or otherwise treat patients, and that nurses in the health services unit triage inmate complaints and schedule inmates to see prison doctors. As for appointments with outside providers, those are scheduled according to provider availability and institutional resources. Plaintiff has not submitted any evidence that these defendants were responsible for any delay in scheduling plaintiff to see an outside provider. Instead, the evidence suggests that, like people outside of prison, plaintiff had to wait until specialists were available. Finally, plaintiff has not submitted any evidence clearly showing that any delay exacerbated his injury or prolonged his pain. Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Instead, the evidence shows that when plaintiff saw specialists, the specialists frequently recommended that he continue the plan of care in place already. Even after seeing specialists, plaintiff continued to complain about chronic pain. Under these circumstances, plaintiff has not shown that these defendants were deliberate indifference to his serious medical needs. McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010) (to support deliberate indifference claim, delay in

treatment must exacerbate injury or unnecessarily prolong pain).

2. Denial of an extra mattress and pillow

Plaintiff next argues that defendants Suliene, Hoffman, Mashak, Greer (director of Bureau of Health Services), Dittman (warden) and Weber (security supervisor) denied his requests for a "medically appropriate mattress and pillow," in violation of the Eighth Amendment. The evidence does not support his allegations. The evidence shows that requests for extra pillows and mattresses had to be approved by the special needs committee. None of the individual defendants could provide plaintiff an extra mattress without approval of the special needs committee. Plaintiff has submitted no evidence showing that any of these individual defendants were on the special needs committee that considered his requests for an extra pillow or mattress, so they cannot be held personally responsible for any denial of an extra pillow or mattress.

Moreover, the evidence shows that the special needs committee at Columbia Correctional Institution approved plaintiff's requests for an extra pillow in 2009, and approved a "thick" mattress restriction in 2010. Plaintiff provides no evidence regarding times in which he was denied an extra pillow, why or who was responsible. As for his mattress claim, plaintiff complains that the special needs committee's approval of a "thick" mattress was meaningless because he already had a "thick" mattress in his cell, the "thick" mattresses were not actually any more supportive than the pre-2009 mattresses, and the "thick" mattresses caused him back pain. However, plaintiff has submitted no evidence

showing that these individual defendants thought that the new mattresses were unsupportive, that plaintiff needed a particular type of mattresses, or that any of them believed that the new mattresses would cause plaintiff a substantial risk of serious harm. Gabb v. Wexford Health Sources, Inc., No. 18-2351, –F.3d–, 2019 WL 2498640, at *4 (7th Cir. June 17, 2019) (rejecting deliberate indifference claim where plaintiff "has no evidence that any course of treatment . . . would have provided him any relief from his chronic back pain"). Although plaintiff says that a different mattress would have helped him, "[c]onclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." Powers v. Dole, 782 F.2d 689, 695 (7th Cir. 1986). Accordingly, plaintiff has failed to show that Suliene, Hoffman, Mashak, Greer, Dittman or Weber violated his Eighth Amendment rights by failing to provide him adequate pillows and mattress support.

### 3. Denial of a raised bunk

Plaintiff also contends that defendants Boodry (lieutenant and captain), Ashworth (unit manager), Nickel (security director), Bovar (correctional officer), Kottka (sergeant), White (health services manager) and Anderson (health services manager), violated his Eighth Amendment rights by placing him in a cell without a raised bunk while he was housed in segregation. The evidence shows that the special needs committee approved plaintiff's requests for a "no floor placement" restriction and a raised bunk, but that for a few weeks during 2012, plaintiff was housed in a cell in DS1 that had a bed only five inches off the

floor. Plaintiff alleges that he complained to each of these individual defendants about being housed on low bunk, and explained to them that getting up and down from a low bunk was extremely difficult and painful for him.

Defendants White and Anderson had no authority to make decisions regarding cell assignments in their role as health services managers. Neither did defendant Bauer, a correctional officer, who had to follow orders about where to move inmates. Therefore, plaintiff's claims against White, Anderson and Bauer fail for lack of personal involvement.

Defendants Boodry, Kottka, Ashworth and Nickel all had the authority to move inmates to particular cells. However, plaintiff has not submitted evidence showing that any other cell was available in the segregation unit to which he had been assigned, on the basis of behavior. He suggests that defendants should have placed him in a different unit, but it is undisputed that plaintiff's own conduct merited his placement in DS1. Additionally, although plaintiff had been approved for a raised bunk restriction, he has not submitted evidence showing that sleeping on a low bunk for a few weeks exacerbated his back and neck problems, let alone evidence that these defendants knew that requiring plaintiff to sleep on the low bunk temporarily presented a substantial risk of serious harm to him. Accordingly, defendants are entitled to summary judgment on this claim as well.


B. Americans with Disabilities Act and Rehabilitation Act

Plaintiff contends that defendants' failure to provide him an adequate mattress and a raised bunk while in segregation also violated his rights under the Americans with

Disabilities Act and Rehabilitation Act. To establish a violation of Title II of the ADA, a plaintiff "must prove that he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015) (citing Love v. Westville Correctional Center, 103 F.3d 558, 560 (7th Cir. 1996) (citing 42 U.S.C. § 12132)).

The Rehabilitation Act is similar to the ADA and provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A claim under § 504 of the Act has four elements: (1) an individual with a disability; (2) who was otherwise qualified to participate; (3) but who was denied access solely by reason of disability; (4) in a program or activity receiving federal financial assistance, which all state departments of corrections do. Jaros v. Illinois Department of Corrections, 684 F.3d 667, 671 (7th Cir. 2012).

Defendants contend that plaintiff has failed to show that he was denied access to benefits, treatments or programs because of a disability. I agree. Plaintiff has not identified any particular service, program of activity of the prison that he was unable to participate in because defendants refused to accommodate his requests for an extra mattress or elevated bunk while he was in segregation. Accordingly, I will grant summary judgment to defendants

on plaintiff's ADA and Rehabilitation Act claims.

## C.  State Law Claims

Plaintiff is proceeding on state law negligence claims against defendants Suliene, Hoffman, Anderson, Mashak, Tenebruso and White.  The general rule is that federal courts should relinquish jurisdiction over state law claims if all federal claims are resolved before trial.  28 U.S.C. § 1367(c)(3); Burritt v. Ditlefsen, 807 F.3d 239, 252 (7th Cir. 2015).  In this instance, I will decline to exercise supplemental jurisdiction over plaintiff's state law claims because I am granting summary judgment to defendants on all of the federal claims. Plaintiff may refile these claims in state court, subject to the applicable Wisconsin statute of limitations.

## ORDER

IT IS ORDERED that

1.  Plaintiff William Teas's motion to strike summary judgment declarations, dkt. #113, is DENIED.

2.  The motion for summary judgment filed by defendants Dalia Suliene, Lillian Tenebruso, Nancy White, Karen Anderson, Meredith Mashak, Anthony Ashworth, Janel Nickel, Scott Bauer, James Kottka, Kevin Boodry, Lucas Weber, Michael Dittman and James Greer, dkt. #75, is GRANTED.

3.  Plaintiff's state law negligence claims against defendants Suliene, Hoffman,

Anderson, Mashak, Tenebruso and White are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 17th day of September, 2019.

BY THE COURT:
/s/
_____
BARBARA B. CRABB
District Judge